## THE EVERETT.

(District Court, D. Maryland. November 3, 1910.)

1. Collision (§ 85*)—Suit for Damages—Evidence.

In a suit for collision between a steamer and a schooner in a fog, the questions whether those navigating the schooner were competent, or whether she gave improper fog signals, are immaterial, where there was no fault in the steering of the schooner, and the improper signals, if given, were not heard on the steamer.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 169; Dec. Dig. § 85.*]

2. Collision (§ 81*)—Steamer and Schooner Meeting in Fog—Insufficient Lookout.

A collision in Chesapeake Bay between a steamer and schooner in a fog more or less dense held due solely to the fault of the steamer in failing to have a lookout stationed in the bow and to stop and reverse at once on hearing a signal from the schooner nearly ahead; there being testimony from the schooner that the steamer could be seen for some time before the collision. The schooner held not in fault because the master, when the steamer was in full view bearing down on him, gave several blasts on a horn to attract her attention, instead of a single blast to indicate that he was on the starboard tack.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 157–166; Dec. Dig. § 81.*]

In Admiralty. Suit by Charles C. Banks as master of the schooner J. Dallas Marvil against the steamer Everett. Decree for libelant.

The J. Dallas Marvil was a three-masted schooner, 160 tons register, loaded with 11,000 bushels of oyster shells and bound from Baltimore to Salisbury, Md. She had a crew consisting of a captain and mate, who were white, and two colored men. She was sunk in a collision with the steamer Everett in the Chesapeake Bay off Sandy Point Light about 3:50 a. m. on the morning of June 15, 1910. At that time, and for some half an hour previously, she had been sailing on the starboard tack. There was very little wind, barely enough to give the schooner steerageway. It was ebb tide.

The Everett was a steam collier of some 8,000 tons register, bound light from Boston to Baltimore. She had her master on the bridge, her second officer and a quartermaster in the pilot house, and a lookout in the crow's nest. There was no lookout at the bow. According to her testimony, she saw nothing of the schooner until its sails loomed up across her bow too late to do anything successfully to prevent a collision. Both vessels were displaying proper lights.

Those on the schooner say that the colored cook was steering while the mate was on the lookout. He claims to have seen the steamer when she was more than half a mile away; that he answered the signals from her fog horn with a tin horn blowing single blasts in reply to single blasts from the steamer; that, as the steamer approached nearer without changing its course, he called the captain, who was his brother. The latter at once came on deck. Those on the schooner testified that when her captain came on deck the steamer was bearing directly down on the schooner and was in plain sight, and the captain says he then blew what he calls the danger signal; that is, a number of blasts on the tin horn. The collision followed very shortly thereafter.

---

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Arthur D. Foster, for libelant.
Wallace, Butler & Brown, for respondent.

ROSE, District Judge (after stating the facts as above). In this case the schooner claims that there was not enough fog seriously to interfere with navigation or to prevent one vessel from seeing the other. It has produced a good deal of testimony to the effect that prior to 4 o'clock in the morning there was in those parts of the bay near where the collision happened no heavy fog. Much of this testimony is from disinterested witnesses. The steamer does not contend that it was a night of thick and continuous fog. Its contention is that at this time, and for some time preceding, the steamer's course ran through thick banks of fog which were quite heavy but which were not continuous; that there might be for a few minutes, a half an hour or more, quite a thick fog, and then the steamer would run out of those banks of fog into atmosphere where it was perfectly easy to see for considerable distances, although there was a haze at all times.

I am inclined to believe that, while the steamer has probably exaggerated somewhat the intensity of the fog, its description of the situation in that respect is not substantially inaccurate. I do not regard it as inconsistent in any marked degree with the testimony on behalf of the schooner. Under the conditions of wind and weather then existing, I should say that the presence of banks of quite heavy fog was very likely. I believe that the fog at the moment was heavier at the point from which the steamer was moving than it was at the place at which the schooner was sailing. There was practically no wind; enough probably to keep steerageway on the schooner, but no more.

Comment has been made by the advocate for the steamer upon the inexperience of the mate of the schooner, a boy of 17, and the negro steersman, who were the only persons on the deck of the schooner until a few moments before the collision. I do not think it necessary to inquire whether these criticisms are justified or not because, in my view of the unquestioned facts of the case, their inexperience, if such it was, had nothing to do with the unfortunate result. It was no fault of the steering of the schooner that brought about the collision; therefore the incapacity or inexperience of the negro steersman is immaterial. It is said that the inexperienced mate on board the schooner blew various blasts on his fog horn which ought not to have been blown according to the rules of navigation. Some of the testimony of the mate, as given before the local inspectors in their investigation of this disaster, makes it not impossible or improbable that he did blow some unnecessary signals. But it is perfectly clear from the testimony of the persons on the steamer that, whether he did or did not, they did not hear them, and they had absolutely no more influence on their course or conduct than anything which happened on the schooner the day before. The testimony from the steamer is clear that there were but two signals from the schooner heard on the steamer, a signal described by the lookout as two blasts, described by the master, the second officer, and the quartermaster as three blasts. That was the first heard on board the steamer. I think it impossible, in view of the testimony given on behalf of the steamer, to believe that there was first a sig-

nal of two blasts and then a signal of three blasts, or first a signal of three blasts and then a signal of two blasts. It is perfectly evident from the testimony of the captain and the second officer and the quartermaster of the steamer, and from the testimony of the lookout, that the signal which the lookout heard and remembers as two blasts was precisely the same signal which the captain, the second officer, and the quartermaster heard and remember as three blasts, because the captain says that just as he heard, or just as he finished hearing, the three blasts, the lookout's voice was heard reporting a vessel on the port bow. The captain evidently believed from his testimony that the lookout was reporting the same thing that the captain heard. The lookout did not then, or at any time preceding the collision, see the schooner. He reported something on the port bow because he heard two blasts of a horn from that direction. The only other signal heard on the steamer from the schooner was one blast, given very shortly before the collision.

Now the captain and the two other witnesses from the schooner all testify that the mate called the captain, telling him that there was a steamer bearing down on them, or words to that effect; that the captain came on deck, saw the steamer, grabbed the horn, and blew a number of blasts; that the mate never had the horn after the captain came on deck; and that the captain did blow a number of blasts. Those were the blasts that were heard on the steamer, and obviously must have been the ones. Whatever the mate did, or left undone, is out of the case, because it was not heard on the steamer, and it had no possible effect upon the actions of the steamer. At the time the captain blew these blasts, the steamer, according to the testimony of all three men who were examined on the schooner, was in plain sight and had been for an appreciable time. This testimony I believe to be true. At the time the blasts were blown, the steamer was in sight and bearing down directly on the schooner, and I cannot hold the captain of the schooner responsible for blowing those blasts instead of sounding one blast to indicate that he was on the starboard tack. The reason I cannot is simply this: He saw the steamer; he did not realize that the steamer could not see the schooner. I am not persuaded that it could not have seen the schooner had there been a lookout at the time at the bow of the steamer. He thought naturally that the steamer could see him as well as he could see the steamer. Under those circumstances, as the steamer was bearing down on him, he must have supposed that the steamer did not see him simply because the steamer was not looking at him. Therefore, the one thing in that condition of imminent peril which he could do was in some way, and in the quickest way he could— for seconds then were of importance—to attract the attention of somebody on the steamer so that they would see his schooner and would avoid it. Upon his assumption that he was where he could be seen, there could be no question of misleading the steamer as to his position and course. I feel that if there was any error there committed it was in extremis. It seems to me that, situated as the captain was, that was the best thing he could do, the only thing he could do. If there was nothing to stop the steamer from seeing the schooner, and if the steamer was bearing down on the schooner, the important thing at the time was

to make the steamer look at the schooner, and that he was trying to do. There was no time to show a flare light or to send off explosives or do anything but to grab the horn which was there and make just as much noise as he could with it so as to make the steamer look at him. He did not succeed in preventing the collision because the steamer had gotten too close. When she first heard the signal, which I believe to have been the signal blown by the captain, she did not at once reverse. When she heard those signals she did not do anything, according to her testimony, but waited until she heard the last blast, which she regarded as a one-blast signal, and then she reversed. It was then too late. I believe that the collision took place almost contemporaneously with that last blast and the order to reverse. It was the duty of the steamer to keep out of the way of the schooner. I believe that, had the steamer had a lookout at the bow, she could have seen the schooner, if not as soon as the schooner saw her, at least sooner than she did see it.

It is in testimony that those on the steamer were then trying to locate the Sandy Point Light. It is possible that in that circumstance is to be found the explanation why they did not see the schooner. I am certain that when she heard those various blasts during the fog it was her business, if she did not see the schooner, to reverse at once or to steer away from the sounds. She did neither, and while, under the circumstances, it is not a case perhaps of gross fault, I cannot see that the schooner did anything that she ought not to have done. The steamer seems to have left undone some of those things which she ought to have done.

I therefore will have to hold that the steamer is solely at fault. If an agreement cannot be arrived at as to the amount of damages to the schooner, there will have to be a reference.